SPRINGFIELD LIGHT, HEAT & POWER CO. v. NORFOLK & W. RY. CO.

(District Court, S. D. Ohio, W. D. June 11, 1919.)

No. 20.

1. CARRIERS ⟜43, 91—RIGHT OF PRECEDENCE OVER COMMERCIAL BUYERS ON CONTRACTS FOR FUEL.

A railroad company, having a contract with a coal company to furnish coal for its engines, on which the coal company was delinquent, after notice of such intention, *held* to have the right to refuse to accept for transportation cars of coal consigned to a commercial buyer, and to appropriate such coal to its own use under the contract, where it was necessary to enable it to operate its trains.

2. CARRIERS ⟜158(1)—CONTRACT FIXING MEASURE OF DAMAGES FOR LOSS OR DAMAGE TO COAL SHIPPER VALID.

Where, under the filed and published tariffs of an interstate railroad company, the rate on coal was based on its value at the mines where shipment was made, a provision of such tariffs, which became a part of its contracts of carriage, that the amount of any loss or damage for which the company was liable should be computed on the value of the property at the time and place of shipment, as applied to a coal shipment is valid and enforceable.

⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

At Law. Action by the Springfield Light, Heat & Power Company against the Norfolk & Western Railway Company. On demurrer to two paragraphs of answer. Overruled.

Hagan & Hagan, of Springfield, Ohio, for plaintiff.

Hollister & Hollister and Joseph Wilby, all of Cincinnati, Ohio, F. Markoe Rivinus, of Philadelphia, Pa., Lucian H. Cocke, of Roanoke, Va., and Theodore W. Reath, of Philadelphia, Pa., for defendant.

HOLLISTER, District Judge. Heard on demurrer to the second and third defenses. The petition alleges, in substance:

[1] Plaintiff is a corporation of Ohio, doing business at Springfield, in that state. The defendant is a corporation of Virginia, and is a common carrier, operating a railroad from Chatteroy, W. Va., to Portsmouth, Ohio, and from Portsmouth to Columbus, and from Portsmouth to Cincinnati. It operates its spur track from Chatteroy in a westerly direction about two miles, to the mine of the Buffalo Coal (Collieries?) Company. Plaintiff, April 1, 1916, contracted with the coal company for certain coal, to be delivered during the year beginning April 1, 1916, "by the terms of which contract said coal was to belong to the plaintiff when put on board cars at said mine." The coal company delivered to defendant at the mine, in cars of the defendant, coal for shipment by the defendant to the plaintiff at Springfield, 39 carloads between October 27, 1916, and February 26, 1917, both inclusive, aggregating 1,891.6 tons, and 400 tons after February 26th. The coal was consigned and shipped over the defendant's rails to Glen Jean, Ohio, and thence to Springfield via the Detroit, Toledo & Ironton Railway. The defendant, although well knowing that the coal belonged to the plaintiff, hauled the cars on the spur track to Chatteroy, thence over its lines to points unknown to plaintiff, and converted the same to its own use, by using it as fuel for its engines, the market value of which coal, at Springfield, at the time of its conversion, was $7.25 a ton, and the freight rate $1.25 a ton. Judgment is prayed for $13,749.60, the measure of damage claimed being at $6 a ton for 2,291.61 tons.

The amended answer, after some admissions with which we need not concern ourselves now, makes denial, as a first defense, of all of the allegations of the petition except those specifically admitted. The allegation that the coal was to belong to the plaintiff, and that the coal company delivered to defendant at the mine the coal for shipment to the plaintiff, were included in the general denial. By way of second defense the amended answer says:

"The mining company (the shipper), at the tipple at the mines, tacks a card or tag to the side of the car, which indicates to the agents of the railway company who are to move the car that the car is to go to the designated scales (East Portsmouth) for weighing. In some instances the car is tagged to the shipper or his sales agent at scales, and in others the ultimate consignee, destination, and route beyond scales are shown on the tag. When the car reaches the scales it is weighed and a waybill issued for further transportation of the car, showing the ultimate consignee, destination, and route, information derived from the shipper or sales agent at scales or from the mine tag. From scales report is made to the shipper of the weight of the car and that

the car is in transit to destination as directed. At all times stated in the petition the Buffalo Collieries Company had notice of this custom and method of handling carload shipments of coal.

"On February 10, 1916, the Buffalo Collieries Company entered into two contracts with the defendant, Norfolk & Western Railroad Company, to sell the railway company coal for one year from April 1, 1916; one contract was for delivery of run of mine coal for a period of one year from April 1, 1916, in minimum amount of 7,800 tons and maximum amount of 11,700 tons, according to the requisitions of the railway company, but in general at a uniform monthly rate of about 650 tons minimum and 975 tons maximum; the other contract was for delivery of stoker coal for the period of one year from April 1, 1916, in minimum amount of 12,000 tons and maximum amount of 24,000 tons, according to the requisitions of the railway company, but in general at a uniform monthly rate of about 1,000 tons minimum and 2,000 tons maximum. The ton referred to in these contracts was therein stipulated to mean the long ton of 2,240 pounds. During all of the time set forth in the petition, the Buffalo Collieries Company was delinquent in the amount of coal requisitioned by the railway company and contracted to be delivered in accordance with the terms of the contract. During all of the time set forth in the petition, the defendant railway company needed this particular coal to operate its railroad.

"The first six cars enumerated in the petition were tagged in accordance with the above-described custom from the mine of the Buffalo Collieries Company. The coal was tagged to scales at East Portsmouth, and the tags indicated the date when tagged, the grade of the coal, the car initial and number, the consignee as the Springfield Light, Heat & Power Company, the destination as Springfield, Ohio, and the route Detroit, Toledo & Ironton. Because the Buffalo Collieries Company was delinquent under its fuel contracts with the railway company, and because of the railway company's need of the coal for its railway operation when the cars arrived at East Portsmouth, the said coal was taken for this purpose and applied to the delinquency of the said fuel contracts, and the said Buffalo Collieries Company was so notified. No waybill was issued for the said coal at scales.

"All the other cars of coal set forth in plaintiff's petition were tagged as described herein by the Buffalo Collieries Company as shipper, and at the time the said cars were tagged the Buffalo Collieries Company was delinquent in its said fuel contracts with the railway company. In accordance with previous notification to the Buffalo Collieries Company the railway company declined to accept the said cars so tagged for commercial shipment to the plaintiff, but in accordance with previous notice to the Buffalo Collieries Company indicated its declination to accept said coal for commercial consignment by changing the tags tacked to the cars by the Buffalo Collieries Company, so as to show the Norfolk & Western Railway Company as consignee in place of the plaintiff, the Springfield Light, Heat & Power Company, and the said coal was thereby received by the railway company only as in performance of the obligation of the Buffalo Collieries Company upon its fuel contracts with the railway company. The said coal was used by the railway company for the necessary operation of its railway. No waybill was issued for the said coal.

"The railway company further avers that it has paid the Buffalo Collieries Company for the coal so applied in the month of October, 1916, to the performance of its said fuel contracts with the Buffalo Collieries Company at the prices agreed upon in the said contracts, and that the Buffalo Collieries Company has accepted such payments for said coal; and the railway company avers that it has offered to pay and is now ready to pay to the Buffalo Collieries Company for the remaining coal so applied the prices agreed upon in said contracts."

### And for a third defense:

"The defendant, Norfolk & Western Railway Company, was at all times mentioned in the plaintiff's petition and is a common carrier of freight, operating lines of steam railroad through the states of West Virginia, Ohio, and other states. In the operation of said railway the defendant was at the times mentioned and is a common carrier of freight in interstate commerce and as

such subject to the act of Congress of February 4, 1887, known as the 'Act to Regulate Commerce,' and the acts amendatory thereof. And before the times above mentioned the defendant had filed with the Interstate Commerce Commission and had published, as required by the said act to regulate commerce, as amended, tariffs of charges publishing commodity rates for the carriage of coal, which tariffs contain rules and regulations affecting the value of the carrier service so offered. By the published terms of its said coal tariffs in effect during all of the times mentioned in the plaintiff's petition, the carriage of the coal specified in the plaintiff's petition was subject to the following rule or regulation: 'The amount of any loss or damage for which any carrier is liable shall be computed on the basis of the value of the property at the place and time of shipment.'

"The defendant accordingly avers that if the plaintiff suffered any damage, which is denied, the measure of such damages is as above prescribed by the published coal tariff, a measure from which the defendant may not lawfully depart. The defendant finally avers that the value of the coal at the time and place of shipment was materially less than the alleged market value of the coal at Springfield, Ohio, $7.25 per ton, as averred in the plaintiff's petition."

Plaintiff contends that inasmuch as the second defense does not specifically deny the petition's allegations of ownership in the plaintiff and that the coal was delivered to the defendant for shipment to plaintiff, that, notwithstanding the denial of these allegations in the first defense, they must be considered as admitted when the facts averred in the second defense are considered. Therefore plaintiff says that, it necessarily appearing that plaintiff was the owner of the coal delivered to the defendant for shipment and appropriated by defendant for its own use, a clear case of conversion is made out.

The case, however, is not so simple as that, for it is clear enough that in the second defense the defendant intended by the special circumstances averred to deny, in addition to its general denial in the first defense, that the plaintiff was the owner of the coal, or that it had ever received the coal for shipment to the plaintiff. Of course, every defense stands by itself, and it would be better (though not decided to be necessary) to incorporate in the second defense a specific denial of these important allegations. That might be done by a short interlineation, and the case will be considered as if that were made.

The second defense makes no distinction between the first six carloads and those following, constituting the great bulk of the coal in question. There is a marked distinction, it would seem, for the reason that the very substance of the defense is that under the circumstances the defendant never received the coal for delivery to plaintiff; that the defendant, as between the Collieries Company and itself, was the owner of the coal the Collieries Company had contracted to deliver to it, and as between itself and the plaintiff that it had precedence over the plaintiff in the delivery to it of coal, because the coal contracted to it was for fuel purposes, without which it could not operate its railroad at all, either for patrons of the mine or for the public generally.

The six cars tagged by the Collieries Company for the plaintiff and hauled to East Portsmouth for weighing had been in fact and according to custom delivered to defendant, and received by it for delivery to plaintiff. Assuming, but not deciding, that defendant's necessity morally justified its taking the six cars in order to keep its railroad

running, the court can see no reason why the defendant should not pay the plaintiff for them. The Collieries Company having thus offered the coal for shipment to the plaintiff, and the defendant having received it for shipping to plaintiff, an absolute duty was imposed on the defendant, as a common carrier, to deliver the coal at the designated destination, for it was plaintiff's coal, not only through plaintiff's contract with the Collieries Company, but because of defendant's relation as common carrier to the consignee.

' The rights of the parties to the balance of the coal, however, are not so easily determined. The Collieries Company had, it is true, after filling cars with coal at the mines, tagged them for transportation to the plaintiff at Springfield; but the cars were not moved in pursuance of that designation, but the defendant removed the tags and tagged the cars to itself as consignee, indicating its intention thereby not to receive the coal for shipment to plaintiff, and having theretofore notified the Collieries Company that it had appropriated the six cars under its fuel contract to supply its fuel needs.

Plaintiff's claim is that the Collieries Company actually did deliver to defendant, for shipment to plaintiff, and thereby title passed to plaintiff; that the coal being tendered for carriage to the plaintiff, the defendant "was bound to receive it and carry it for that purpose, or to reject it altogether and take such legal consequences as might follow the rejection," and cites Atlantic, etc., Co. v. Vulcanite, etc., Co., 203 N. Y. 133, 96 N. E. 370, 36 L. R. A. (N. S.) 622, to the proposition that:

"A bailee for hire to transport and store material for the bailor, who contracts to purchase a quantity of such material from the bailor, cannot fill the order from material in his possession, without the consent of the bailor, and his attempt to do so will justify termination of the bailment."

But defendant, while admitting that as a general rule a common carrier is bound to accept goods tendered to it for shipment, avers that under the circumstances of this case it was not bound to accept shipment. An analysis of its position would seem to indicate that there are two reasons which excused it, both involving the fact that the coal was necessary for the actual operation of its railroad.

One reason is that the coal was, in substantial effect, as against the plaintiff, its own coal, which the Collieries Company had agreed to deliver, but was delinquent, and that, being necessary fuel coal, it took precedence over the plaintiff as contractee for commercial coal.

The other reason is that the tender by the Collieries Company to it was of the Collieries Company's own wrongdoing, after notice of defendant's insistence on the receipt of its fuel coal under the contract, and that plaintiff cannot take advantage of the wrongdoing of the Collieries Company, and thereby force on defendant the relation of common carrier, and thus give it, as purchaser of commercial coal, an advantage over the defendant as purchaser of the very fuel coal necessary in its operations.

On the case as it stands, if the coal were plaintiff's coal, and the defendant bound to transport it, it could not do so, because it would not have the coal necessary to fire its engines, and the plaintiff's coal

would remain at the mines, of no benefit either to the plaintiff, or to the defendant, or to the Collieries Company. It would not seem necessary to cite authorities to the proposition that a railroad cannot be operated without fuel for its engines; but the Interstate Commerce Commission, in working out problems before it, has so said, in Traer v. Railroad, 13 Interst. Com. Comn. R. 451. In Royal Coal & Coke Co. v. Southern Ry. Co., 13 Interst. Com. Comn. R. 440, 447, it was said:

"The railroads must have fuel; they are entitled, and indeed required by law, to take all proper and just measures to assure the regularity and certainty of their fuel supply. * * *"

The appropriation of this coal by defendant would not be the exercise of any paramount right by which the property of the plaintiff was taken without compensation. It merely amounts to postponing plaintiff's delivery until defendant may have the coal to operate its railroad and then serve plaintiff.

It would seem that, in the nature of things, the mine owner having contracts to deliver commercial coal, and having contracts with the railroad company, operating to and from its mine, for the railroad company's necessary fuel coal, that it is the duty of the mine owner to supply the fuel coal before supplying the commercial coal. Indeed, one would think that the contractor for commercial coal would be bound by the implication that the mine owner with whom he had contracted would, if the mine owner had also a contemporaneous contract with a railroad company for fuel coal, necessarily fill its contract with the railroad company first, at least to the extent of sufficient coal to enable it to carry commercial coal to the end of its line.

The Interstate Commerce Commission had somewhat the same question, arising in a different way, in Royal Coal & Coke Co. v. Southern Ry. Co., 13 Interst. Com. Comn. R. 440. One of the questions there went to the relative rights of contractors for commercial coal and railroads contracting for fuel coal at the same mine, with respect to the distribution of cars in times of car shortage. In the opinion (Commissioner Cockrell) it was said (page 448):

"The carrier must be free to contract for the total output of a mine, if it so desires; or it may contract for any part of a mine's output less than the whole, and it is entitled to get its fuel coal first, for without fuel it cannot haul even commercial coal to its destination, to say nothing of complying with its obligations to the public at large; but in all its acts it must deal evenhanded justice in the matter of car distribution as in the matter of rates. If a mine contracts to furnish only a part of its output to the railroad for fuel, and if the filling of its contract with the railroad calls for its full pro rata of cars, or more, then it should not receive other cars for commercial shipments, If such a mine in filling its contract to supply fuel coal to the railroad does not exhaust its equitable pro rata of cars, then cars should be given it for commercial shipments sufficient to complete its full pro rata share of all available cars."

This is a distinct recognition of the undeniable fact that, in the nature of things, the carrier, in order to carry from a mine any commercial coal at all, must have that mine owner fulfill its fuel contract with the railroad. When, therefore, this coal was placed on the de-

fendant's cars, and the defendant, without moving it, and after notice, asserted the right of precedence which necessity gave it, the plaintiff had no right to complain of mere postponement of delivery to it under its contract with the Collieries Company.

The rule that a common carrier is bound to receive goods tendered for carriage is not hard and fast. There are reported cases showing exceptions. In The Idaho, 93 U. S. 575, 23 L. Ed. 978, it was held that a common carrier may show, as an excuse for nondelivery pursuant to his bill of lading, that he has delivered the goods upon the demand of the true owner.

In Valentine v. Long Island R. R. Co., 187 N. Y. 121, 79 N. E. 849, it appearing that the railroad company, having received certain rails for shipment over its lines, without knowledge that the rails were its property, and afterwards discovered that they were, had the right to appropriate the rails. In both of these cases the tender, the acceptance, the delivery were without question.

In the case here the Railroad Company notified the Collieries Company that it would not accept for shipment the commercial coal, and laid claim to the coal as its own. The Collieries Company could not force it into the relation of a common carrier, when it, without fault on its part, was unable to perform what would ordinarily be the duty of a common carrier, when it had given notice of its inability to perform the service due and demanded of it as a common carrier. The Supreme Court of the United States say so in Eastern Railway v. Littlefield, 237 U. S. 145, 35 Sup. Ct. 491, 59 L. Ed. 878, in so many words:

"But where, without fault on its part, a carrier is unable to perform a service due and demanded, it must promptly notify the shipper of its inability; otherwise, the reception of goods without such notice will estop the carrier from setting up what would otherwise have been a sufficient excuse for refusing to accept the goods, or for delay in shipment after they had been received."

That case also had to do with car shortage which made it impossible for a carrier to furnish a reasonable number of cars for an accepted shipment, and it was held that the carrier, though not responsible for the car shortage, could not avoid liability, since it had given no notice to the shipper. Plaintiff's counsel say that the statement quoted is a dictum only. If it is, it has, nevertheless, coming as it does from the Supreme Court, a very persuasive influence.

The case here is stronger than that, for shipment was not accepted, and the notice said it would not be accepted. The wrongdoing of the Collieries Company in tagging the cars for the plaintiff contrary to the notice could not, as heretofore said, compel the defendant into a relation it expressly declined, for justifiable reasons, to assume. This particular coal, as between defendant and plaintiff, belonged to defendant, and it owed the plaintiff no duty with respect thereto.

Since the demurrer goes to the whole defense, and the defense being good as to the cars other than the first six cars, the demurrer must be overruled.

The question raised by the demurrer to the third defense is whether or not, for those six cars, the defendant must pay their value at the

time and place of delivery or their value at destination; the former value being alleged to be less than the latter.

[2] This demurrer will be overruled, also, for the reason that the published terms of defendant's coal tariffs in effect at the time, filed with the Interstate Commerce Commission and published according to law, fix the measure of damage for loss or damage on the basis of the value of the property at the place and time of shipment. Of course, the tariff rates are measured by the value of the service. The published rate is on the basis of the value of the coal at the mine. A greater value than that would call for a higher rate than the published rate. To permit the plaintiff to recover for a greater value than at the mine, while paying the same rate as other shippers, would be a discrimination in favor of the plaintiff.

The subject was dealt with in Shaffer v. Railway Co., 21 Interst. Com. Comn. R. 8. In that case the bill of lading contained an agreement the effect of which was substantially the same with respect to the amount of loss or damage, and fixing it as of the value of the property at the place and time of shipment. In the report of the commission in that case it was said:

"The contract complained of admittedly changes the common-law rule which makes the carrier liable for the value of the property at the place of destination."

It was held also that the contract did not attempt to relieve the carrier from the payment of the full value of the property, but only determined the time, place, and manner in which that value should be definitely ascertained, and a number of cases are cited to the point that such an agreement is not at all a limitation of the carrier's liability and is reasonable. See, also, Rogan v. Railway Co., 51 Mo. App. 665; Grubbs v. Railroad Co., 101 S. C. 210, 85 S. E. 405. It is true that a bill of lading (both a contract and a receipt; Pollard v. Vinton, 105 U. S. 7, 8, 26 L. Ed. 998) was involved in that case, and there is none here; but the plaintiff is claiming, and it is here held as to the six cars, that a contract of carriage had been entered into.

The quoted provision of the regulations fixing the damage was a part of the law of that contract, and was carried into it and becomes as much a part of it as if written into a bill of lading. Apparently, the ordinary rule permitting an election to sue for breach of contract or for the tort does not obtain in cases such as these. It was said by Mr. Justice Hughes, in Georgia, etc., Railway Co. v. Blish Milling Co., 241 U. S. 190, 197, 36 Sup. Ct. 541, 544 (60 L. Ed. 948):

"It is urged, however, that the carrier in making the misdelivery converted the flour, and thus abandoned the contract. But the parties could not waive the terms of the contract under which the shipment was made pursuant to the federal act; nor could the carrier by its conduct give the shipper the right to ignore these terms, which were applicable to that conduct, and hold the carrier to a different responsibility from that fixed by the agreement made under the published tariffs and regulations. A different view would antagonize the plain policy of the act and open the door to the very abuses at which the act was aimed."

An order may be taken overruling the demurrers.