## Chesapeake & O. R. Co. v. State Nat. Bank of Maysville.

June 23, 1939.

As Modified and Extended on Denial of Rehearing Nov. 17, 1939.

LeWright Browning and Browning, Ziegler & Cochran for appellant.

B. S. Grannis and Richard P. Dietzman for appellee.

OPINION OF THE COURT BY JUDGE FULTON—Reversing.

The appellant, Chesapeake and Ohio Railway Company, is appealing from a judgment for $2,359.38 in favor of the appellee, State National Bank of Maysville, Kentucky. The appeal presents a pure question of law, since all material facts were stipulated by the parties.

The Star Produce Company, located at Maysville, for a long time prior to July 6, 1935, had been a shipper of poultry over the line of the Railway Company, and shipments were ordinarily carried by an eastbound freight train known as No. 92, leaving Maysville at 3 o'clock in the morning. The freight depot of the Railway Company closed at 4:30 P. M., but the custom had long existed for the Railway Company to spot empty cars on the Produce Company's spur track for the purpose of being loaded with poultry and to issue bills of lading on cars the loading of which had been started and possibly on cars on which no loading had been done, with the understanding that the cars would be loaded after the bills of lading were issued and placed in train No. 92. When these bills of lading were issued the Railway Company knew that the loading of the cars had not been completed, but did not know to what extent the loading had been accomplished. The agent made no examination of any of the cars spotted or their contents before issuing bills of lading.

On July 6, 1935, pursuant to this custom, the Railway Company spotted a car on the Produce Company's spur track and, not knowing whether the car was loaded in whole or in part, issued a uniform straight bill of lading to the Produce Company for a car of live poultry of the weight of 14,000 pounds with the notation "shipper's load and count" on the bill. As a matter of fact, at the time of the issuance of the bill of lading on this car only 3,010 pounds of poultry were loaded on it and no more was ever loaded thereon, and the agent was told that the loading would be completed that night in time for the car to go out on train No. 92.

On July 11, five days after the issuance of the first bill of lading, and at a time when the Railway Company knew that the car above mentioned had not been completely loaded and was still standing on the spur track, the Railway Company spotted another car for loading. Not only was the car of July 6 not loaded, but

still a third car spotted for poultry (not involved in this litigation) for which a bill of lading had been issued on July 9 remained unloaded. After this second car had been spotted for the Produce Company, on July 11 a straight bill of lading on this second car similar in all respects to the first bill of lading, except that no notation of "shipper's load and count" appeared thereon, was issued to the Produce Company pursuant to the custom above mentioned, covering 14,000 pounds of live poultry. As a matter of fact, no poultry was ever loaded into this last mentioned car. Both cars, of July 6 and July 11, were recited in the bills of lading to be consigned to Julius Kastein, Inc., of New York.

On the date of the respective bills of lading the Produce Company drew a draft upon the consignee named in the bills of lading for the sum of $1,800 each and discounted the drafts with the bank. If the cars had been loaded with 14,000 pounds of live poultry, this cargo would have been of the value of $1,800 for each car. The Bank, before discounting the sight drafts, received a guarantee signed by the Lawyers County Trust Company of New York, pursuant to instructions from Julius Kastein, that the drafts would be paid on condition that the cars of live poultry were received in New York within one week from the date of the bill of lading. The drafts with the respective bills of lading attached were forwarded for collection, but the consignee refused to pay them and they were returned to the Bank. At the time the drafts were returned, the Produce Company had on deposit with the bank $1,240.62, which was credited against the $3,600 advanced on the two drafts, leaving a balance of $2,359.38, the amount for which judgment was rendered in favor of the Bank against the Railway Company.

At the time the Bank discounted the drafts, it had no knowledge that the loading of the cars had not been completed and in discounting the drafts it was pursuing a course of conduct similar to that had between the Bank and the Produce Company theretofore. The loading of the cars was not completed because the Produce Company became insolvent and unable to comply with its agreement to load or complete the loading.

The rights of the parties in any action upon bills of lading issued by a common carrier for the transportation of goods in inter-state commerce are governed by

the Federal Bill of Lading Act, 49 U. S. C. A., Sections 81 to 124. The Act itself, Section 1, so provides.

Prior to the enactment of the Federal Bill of Lading Act, bills of lading had not attained the exact status of negotiability although they were regarded as symbolic representations of the goods and title to the goods was passed by transfer of the bills with intention to transfer title. Consequently, it was definitely established in the Federal Courts and in most other jurisdictions that no liability was imposed on a carrier by reason of the issuance of a bill of lading when no goods had been in fact received, even in favor of an innocent purchaser for value of such a bill. Friedlander v. Texas & P. R. Company, 130 U. S. 416, 9 S. Ct. 570, 32 L. Ed. 991; Missouri Pacific Railway Company v. McFadden, 154 U. S. 155, 14 S. Ct. 990, 38 L. Ed. 944; National Bank of Commerce v. Chicago, etc. R. Company, 44 Minn. 224, 46 N. W. 342, 560, 9 L. R. A. 263, 20 Am. St. Rep. 566. The basis of the rule was that it was not within the apparent scope of authority of a carrier's agent to issue a bill of lading for goods when none had been received and that therefore the carrier was not estopped to deny receipt of the goods.

Primary purposes of the bill of lading act, apparently, were to confer complete negotiability on certain types of bills (order bills) and to change the rule referred to, in so far as it applied to order bills. Negotiability was not conferred on order bills in express terms but the implication of negotiability is obvious when the entire act is considered.

By Section 2 of the act a straight bill of lading is defined as "a bill in which it is stated that the goods are consigned or destined to a specified person." Section 3 of the act defines an order bill as a "bill in which it is stated that the goods are consigned or destined to the order of any person named in such bill." Section 29 of the act provides in part that:

"A straight bill can not be negotiated free from existing equities, and the indorsement of such a bill gives the transferee no additional right."

While the act does not confer negotiability on straight bills, it recognizes the status of transferability and Section 32 defines the rights of a transferee thereof in part as follows:

"A person to whom a bill has been transferred, but not negotiated, acquires thereby as against the transferor the title to the goods, subject to the terms of any agreement with the transferor. If the bill is a straight bill such person also acquires the right to notify the carrier of the transfer to him of such bill and thereby to become the direct obligee of whatever obligations the carrier owed to the transferor of the bill immediately before the notification."

The section of the act changing the rule of nonliability for issuance of a bill covering goods which had not been received is Section 22, which provides:

"If a bill of lading has been issued by a carrier or on his behalf by an agent or employee the scope of whose actual or apparent authority includes the receiving of goods and issuing bills of lading therefor for transportation in commerce among the several States and with foreign nations, the carrier shall be liable to (a) the owner of goods covered by a straight bill subject to existing right of stoppage in transitu or (b) the holder of an order bill, who has given value in good faith, relying upon the description therein of the goods, for damages caused by the nonreceipt by the carrier of all or part of the goods or their failure to correspond with the description thereof in the bill at the time of its issue."

It will be observed that the last mentioned section changed the rule referred to only as to order bills and, in view of the rule existing when the act was passed, the situation is exactly the same as if the act had declared in express terms that as to the straight bills issued on goods not received no liability could be imposed on the carrier.

By virtue of Section 29, there could be no liability on the part of the carrier in the instant case in an action on the bills by a holder or transferee, since an "existing equity" of the carrier was a right on its part to deny receipt of the goods as to the shipper, and a transfer of these straight bills created no additional rights.

By virtue of Section 32, defining the rights of a transferee of a straight bill, the transferee acquires only the right to become "the direct obligee of whatever obli-

gations the carrier owed to the transferor" and the carrier owed the transferor no obligation since no goods were received.

Again, since the status of straight bills was not changed by Section 22, imposing liability on a carrier for issuing an order bill covering goods not received, the holder or transferee of the bills has no cause of action thereon against the carrier.

So plain and unambiguous is the act and so obvious are the conclusions we have enunciated, that counsel for appellee frankly concede that if appellee were a transferee or holder of the bills, suing on the bills, there would be no right of action. To avoid the application of the bill of lading act, or rather in an attempt to short circuit the act and give it, in slang parlance, "the run around," counsel take the position that the Bank is not a transferee or assignee of the bills and that the action is one based, not on the bills, but on the reckless or negligent use of language falsely certifying the receipt of loaded cars for shipment.

The position that the action is not on the bills but is based on the reckless or negligent use of language amounts to nothing more or less than a contention that the carrier is estopped to deny liability because it issued a bill certifying the receipt of goods when none had, in fact, been received. In short, we are urged to ignore the existence of the act and hold the carrier liable under the doctrine of estoppel. This we may not do since the bills were issued for the transportation of goods in inter-state commerce and by the terms of Section 1 of the act all rights and liabilities under such bills must be governed by the act.

Were we to ignore the act, we would still be confronted by the rule previously mentioned, established by the overwhelming weight of authority, that estoppel cannot be invoked against the carrier to establish liability in these circumstances.

Again, the negligent or reckless language on which counsel assert the action is founded, language certifying the receipt of goods, is the language of the bills— were the bills ignored, there would be nothing on which to base the action, since no representation was made apart from them.

The bills were filed with the petition as exhibits,

which procedure, in itself, seems to have been a recognition by appellee that the action was in fact, as well as in legal effect, based on the bills. A litigant may not by an attempted characterization of the nature and form of his action control the application of legal principles—the court must look beyond the attempted characterization and ascertain the true scope and nature of the action. When we do so, we are unable to escape the conclusion that the action is one based on the bills.

Indeed, it seems that every action wherein federal tariffs, regulations and statutes applicable to carriers are involved, must be considered in the light of such tariffs, regulations or statutes and that a litigant may not by an attempted characterization of his action avoid their application. Atchison T. & S. F. Company v. Harold, 241 U. S. 371, 36 S. Ct. 665, 60 L. Ed. 1050; Ga. F. & A. R. Company v. Blish Milling Company, 241 U. S. 190, 36 S. Ct. 541, 60 L. Ed. 948; Springfield Light, Heat & Power Company v. N. & W. R. Company, D. C. Ohio, 260 F. 254; Moore v. Duncan, 6 Cir., 237 F. 780.

In any event, and independent of other considerations, we are of the opinion that as the bills were issued for the transportation of goods in inter-state commerce, liability of the carrier must be determined under the bill of lading act and that any action in connection with this issue is necessarily on the bills. Nor does the fact that the cars were not loaded or received for shipment militate against this conclusion since Section 1 of the act refers to "bills of lading issued * * * for the transportation of goods" and the operation of the act is not predicated on actual loading.

In support of the Bank's position that it is not an assignee or transferee of the bills, it is argued that the bills were not assigned or transferred by the consignee, in whom, says the Bank, title to goods covered by a bill of lading is vested. It is further suggested that title to such poultry as was actually loaded on one of the cars became vested in Julius Kastein, the consignee.

The assumption that title vests in the consignee is perhaps correct for the general rule seems to be that a shipper by taking the bill in the name of the consignee vests apparent title in him, but it does not follow that the shipper, or consignor, has no transferable interest in the bill or the goods. It seems to be uniformly held that a consignor has a special property in the goods, which

he may transfer, and that discount of a sight draft with the bill attached is a transfer of the bill. The rule is stated in the text of 10 C. J. 202 (Carriers, Section 267) as follows:

"Where the consignor draws on the consignee for the purchase money and the draft with bill of lading attached is endorsed or transferred to someone who discounts the draft, a special property in the goods passes to the transferee, subject however, to be divested by acceptance and payment of the draft. * * * In the application of the rule it is likewise immaterial that the party paying the draft had obtained a guaranty from the consignee that the draft would be paid."

Many authorities are cited in the footnotes to this section which amply sustain the text, including two cases from this court, Temple National Bank v. Louisville Cotton Oil Company, 82 S. W. 253, 26 Ky. Law Rep. 518; and German National Bank v. Grinstead, 52 S. W. 951, 21 Ky. Law Rep. 674.

In a later case, George F. Hinrichs, Incorporated, v. Standard Trust & Savings Bank, 2 Cir., 279 F. 382, certiorari denied, 258 U. S. 629, 42 S. Ct. 462, 66 L. Ed. 800, a consignor in a straight bill of lading discounted at the bank a sight draft drawn on the consignee with the bill of lading attached. It was held that the legal title to the bill passed to the Bank and that, though the carrier properly delivered the shipment to the consignee without requiring surrender of the bill, the consignee, after notice of the transfer to the bank, had no right to sell the goods and apply the proceeds on indebtedness due it by the consignor without paying the draft.

In Tennessee Egg Company v. Monroe, 1925, 151 Tenn. 121, 268 S. W. 372, certiorari denied, 269 U. S. 580, 46 S. Ct. 105, 70 L. Ed. 422, it was held that by virtue of the bill of lading act a consignor using a straight bill retains control of the goods, can reclaim them, convey them to a third party or stop them in transitu. We might add that these conclusions are plainly apparent from a reading of that part of Section 32 of the act above quoted.

The authorities cited and the provisions of the act itself convince us that the appellee must be deemed a transferee of the bills in question, consequently a holder of the bills. The inevitable deduction seems to be that,

being a holder of the bills, any action by it in connection therewith must be an action on the bills, this deduction being a further refutation of the position taken by counsel that the action was not based on the bills, but on the reckless or negligent use of language.

Great reliance is placed by appellee on Chicago & N. W. R. Co. v. Stephens Nat. Bank of Fremont, 8 Cir., 75 F. (2d) 398, in which the facts were the same as in the instant case except that neither car had anything loaded on it and the bills were "order notify" bills, containing the notation "shipper's load and count." The carrier was held liable, the court seeming to have reached this conclusion largely by applying the doctrine of estoppel.

It appears to us that that court reached the right conclusion but used the wrong approach in doing so. It was unnecessary to invoke the doctrine of estoppel, which had no application because of the rule previously mentioned, and recognized in the opinion, that prior to the enactment of the bill of lading act no liability could be imposed on the carrier by reason of the issuance of a bill covering goods not received. Liability of the carrier could have been demonstrated by reference to Sections 21 and 22 of the act, as was done by the Illinois court.in a case where the exact question was involved, Mid-City Trust & Sav. Bank v. Chicago, Milwaukee & St. Paul Ry. Co., 192 Ill. App. 225, cited with approval in the Stephens Bank case. Section 22 of the act provides that, with certan limitations with which the court was not concerned, the carrier shall be liable to a purchaser for value of an *order* bill for damages caused by the nonreceipt of the carrier of all or part of the goods. But as the bills in the Stephens Bank case contained the notation "shipper's load and count," it was necessary to refer to Section 21 of the act, which limits the liability imposed by Section 22 by declaring that "The carrier may also by inserting in the bill of lading the words 'Shipper's weight, load, and count,' or other words of like purport indicate that the goods were loaded by the shipper and the description of them made by him; *and if such statement be true,* the carrier shall not be liable for damages caused by the improper loading or by the nonreceipt or by the misdescription of the goods described in the bill of lading."

By this section the limitation (or non-existence) of

the carrier's liability is predicated on the truthfulness of the words in the bill indicating that the goods were loaded by the shipper. Since no goods were loaded, and the cars never received for shipment, the notation "shipper's load and count" was necessarily untrue and could not operate in the carrier's behalf to avoid liability. Since nothing was loaded on the cars, there was no load and no count, either by the shipper or the carrier and the carrier was bound to know it. The bills being order bills were negotiable and created additional rights in the transferee which were not created by the transfer of the straight bills in the instant case. The court in that case, in commenting on Section 22 of the act, said:

"It enlarged the agent's implied authority by imposing a new liability on the principal for the agent's act in issuing the bill, even though the merchandise was not received."

That court, however, failed to point out that this new liability imposed on the carrier was imposed only in favor of the holder of an *order* bill, which, in justice to that court, we might add it was not essential to point out as order bills and not straight bills were involved. We are in accord with the conclusion reached in that case but are of the opinion that it is applicable only to order bills.

Another case cited and relied on by appellee is Olivier Straw Goods Corporation v. Osaka Shosen Kaisha, 2 Cir., 27 F. (2d) 129, certiorari denied, 278 U. S. 618, 49 S. Ct. 22, 73 L. Ed. 540, but we do not regard that case as authority for the reason that the bills were issued covering a shipment originating in Japan and the Federal Bill of Lading Act is not applicable to bills of lading originating in a foreign country. U. S. C. A. Title 49, Section 81; Williston on Contracts, Vol. 4, Section 1116.

In view of our conclusions that the Bank was a transferee of the bills, suing on the bills, and that no liability attaches to the carrier under the bill of lading act which must control, it follows that the trial court was in error in rendering judgment against the appellant.

Judgment reversed, with directions to enter a judgment dismissing the petition.