519 P.2d 199

**ARIZONA FEEDS, an Arizona corporation, Appellant,**

**v.**

**SOUTHERN PACIFIC TRANSPORTATION COMPANY, a corporation, Appellee.**

**No. 2 CA–CIV 1491.**

Court of Appeals of Arizona, Division 2.

Feb. 27, 1974.

Rehearing Denied April 3, 1974.

Review Denied April 23, 1974.

348

Wolfe, Greer & Mustacci by John Greer, Tucson, for appellant.

Bilby, Thompson, Shoenhair & Warnock, P. C. by Max C. Richards, Tucson, for appellee.

## OPINION

HOWARD, Judge.

In this action appellee Southern Pacific Transportation Company, hereinafter referred to as Southern Pacific, sought to recover the freight charges for five cars of bulk barley delivered to Arizona Feeds in Phoenix. The case was tried to the court, without a jury, which made findings of fact, conclusions of law and entered judgment against appellant Arizona Feeds for the full amount of the freight charges in the sum of $14,807.26. We shall recite the facts in this case as found by the trial court excepting from said recitation portions of the findings of fact which are in reality conclusions of law.

Arizona Feeds is an Arizona corporation with its principal place of business in Tucson, Arizona. At the time of the transactions hereinafter set forth, Arizona Feeds

also maintained and operated a feed manufacturing plant in Phoenix, Arizona. This plant had a railroad spur adjacent to it for receiving bulk rail shipments of the commodities used in Arizona Feeds' manufacturing process.

Southern Pacific is a common carrier doing business in Arizona and elsewhere.

On November 5, 1970, Arizona Feeds contracted to purchase from Moses Lake Grain & Livestock Company of Moses Lake, Washington, hereinafter referred to as Moses Lake, nine cars of #2 Montana barley (rolling grade) at the "delivered" price of $2.85 per hundred weight, to be delivered to Arizona Feeds' plant in Phoenix. Moses Lake was instructed to deliver the first five cars to the Phoenix plant and mail the bills of lading to Arizona Feeds' Phoenix post office box number. Only five of the nine carload orders were actually received by Arizona Feeds. In the commodity trade, a "delivered" price includes the cost of the commodity and all freight and haulage charges to its destination.

Subsequent to November 5, 1970, Farmer's Union Grain Terminal Association delivered the subject five cars of bulk barley to the Burlington Northern Railroad Company at Glasgow, Montana on the following dates and on such dates, Burlington Northern issued five "straight uniform bills of lading—short form" with respect to each of such cars as follows: November 12, 1970, a bill of lading, reference car # GN172056 and a bill of lading, reference car # NP76496; November 19, 1970, a bill of lading, reference car # NP18419 and a bill of lading, reference car # NP15000; November 24, 1970, a bill of lading, reference car # GN34060.

All five bills of lading named Moses Lake as consignee and directed that the cars be held at Shelby, Montana ·for inspection and orders. All of the bills of lading contained the following language in the "Remarks" column: "Freight to be paid by Moses Lake Grain & Livestock Co., Moses Lake, Washington."

Neither the space provided in a bill of lading to show that the freight charges were to be prepaid nor the space provided for negating recourse on the consignor, Farmer's Union Grain Terminal Association, was completed.

Moses Lake gave Burlington Northern Railroad Company diversion orders to divert the five cars from Shelby, Montana, to Arizona Feeds at its Phoenix plant by three telegrams on the following dates: November 12, 1970, cars # NP76496 and # GN172056; November 19, 1970, cars # NP18419 and # NP15000; and December 21, 1970, car # GN34060. None of these diversion orders contained any instruction modifying the original bill of lading instructions as to payment of the freight charges. No exchange bills of lading were issued for any of the five cars. One of the accepted purposes and uses of an exchange bill of lading is to change a bill to a "prepaid" or "to be prepaid" bill or vice-versa.

As a result of the three diversion orders Burlington Northern delivered the five cars to Southern Pacific, the connecting carrier, and furnished Southern Pacific with copies of the five bills of lading. By letter dated November 23, 1970, Moses Lake sent Arizona Feeds two of the five bills of lading and requested early payment. While the exact date Arizona Feeds first received the other three bills of lading could not be precisely determined, the customary practice was for Arizona Feeds' Phoenix plant production manager to hold the bills and use the information therein contained to identify incoming rail cars and their contents. Presumably, that procedure was followed and applied in connection with these transactions. In any event, Arizona Feeds had the appropriate bills of lading in hand prior to making any payment.

By December 9, 1970, Southern Pacific had delivered and Arizona Feeds had accepted, unloaded, and released to Southern Pacific the first two cars and mailed its check to Moses Lake in the sum of

$10,779.84 in payment for the grain and all freight and haulage charges to Phoenix, Arizona. The amount of this check, as well as subsequent checks, was calculated by using the actual weight shown on the bills of lading covering the particular car times the $2.85 per hundredweight delivery price.

By December 11, 1970, Southern Pacific had delivered and Arizona Feeds had accepted, unloaded, and released to Southern Pacific the third and fourth cars. On December 11th, Helen Williams, of Arizona Feeds' accounts payable department in Tucson, received three freight bills from Southern Pacific's accounting office in Los Angeles, California on the first three cars received by Arizona Feeds. She advised Villa Horner, Arizona Feeds' assistant purchasing agent in Phoenix of such receipt.

On December 16, 1970, Arizona Feeds paid Moses Lake the sum of $7,115.60 in payment of the delivered price for the third and fourth cars received.

On December 21, 1970, Arizona Feeds received a freight bill for the fourth car from Southern Pacific's accounting office in Los Angeles, California. Arizona Feeds contacted Moses Lake and was told that it had been taken care of.

By January 7, 1971, Southern Pacific had delivered and Arizona Feeds had accepted, unloaded and released to Southern Pacific the fifth and final car. On January 18, 1971, Arizona Feeds issued its check in the sum of $3,488.40 payable to Moses Lake for the fifth car. However, the check was held by Arizona Feeds' internal auditor and manager of methods and procedures, Harry Aronson, who telephoned Art Rutka, Southern Pacific's Tucson traveling freight and passenger agent. Aronson advised Rutka that the bill was a "to be prepaid" bill and "freight was to be paid by Moses Lake" and that he was holding up payment on the car. Rutka advised Aronson that Arizona Feeds was not responsible and was at liberty to go ahead and make payment to Moses Lake. On

February 6, 1971, Arizona Feeds received a freight bill from Southern Pacific for the fifth car.

The total freight bill for the delivery of the five cars in question was $14,807.26.

Of the total amount due $2,591.86 was the freight bill for the fifth car. Arizona Feeds would not have paid Moses Lake the portion of the delivered price attributable to the freight for the fifth car except for the telephone conversation with Rutka. However, Rutka would not have advised payment to Moses Lake if Aronson had not informed him that there was a "to be prepaid" bill of lading.

Based upon the foregoing facts the trial court made the following conclusions of law:

"1. The Southern Pacific Transportation Company having delivered the five cars of barley to defendant, Arizona Feeds, is entitled to the tariff charges for said delivery.

2. The correct amount of the tariff charges for delivery of said barley is $14,807.26.

3. Receipt of the shipment by the consignee creates a legal obligation to pay the freight charges whether demanded at the time of delivery or later, in the absence of any agreement to the contrary. No such agreement has been proven by the evidence.

4. The plaintiff is required under the provisions of 49 U.S.C. Section 6, to collect all interstate freight charges.

5. Since Section 7 provision of the subject Bills of Lading were not executed by the original shipper, the plaintiff railroad was not obligated to collect freight charges before delivery.

6. The claimed defense of estoppel is not applicable for two reasons:

(a) all of the conduct upon which the defendant claims estoppel occurred after the cars were delivered by the plaintiff and received by the defendant;

(b) to constitute a prepaid shipment the applicable column in the Bill of Lad-

ing must be noted to be 'prepaid' and a written language set forth in the remarks column does not constitute grounds for estoppel, nor create a binding obligation on the part of the carrier.

7. Plaintiff is further not estopped to collect freight charges for the fifth car since defendant unintentionally misrepresented a material fact to plaintiff.

8. Plaintiff is entitled to judgment against the defendant in the amount of $14,807.26, together with interest at the rate of 6% per annum, from February 3, 1971, until paid, together with its costs incurred herein."

Arizona Feeds presents the following questions for review:

"[1] Can a contract be 'implied' to compel defendant to twice pay the freight charges where such a contract would be in *direct conflict* with the express contracts of haulage and under circumstances devoid of discrimination or 'preference' under the Interstate Commerce Act?

[2] Should defendant's Motion for Judgment made at the close of plaintiff's case in chief have been granted upon the grounds the plaintiff failed to prove the contracts of haulage or any breach thereof?

[3] Was defendant's post trial Motion for New Trial et cet. improvidently denied?

[4] Can a Subpoena Duces Tecum directing a corporate plaintiff to produce documents during trial be quashed without a showing that it was unreasonable and oppressive upon the plaintiff to so produce them, and upon motion made after the time designated in the Subpoena for compliance therewith?

[5] Is pre-judgment interest allowable upon an unliquidated claim for freight charges?"

■ Liability for freight charges for transportation in interstate commerce is governed by federal statutes so far as ap-

plicable and otherwise by common law principles. New York, N. H. & H. R. Co. v. California Fruit Growers Exchange, 125 Conn. 241, 5 A.2d 353 (1939); Pennsylvania R. Co. v. Lord & Spencer, Inc., 295 Mass. 179, 3 N.E.2d 231 (1936).

■ In the absence of any statutory provision or binding rule or regulation to the contrary, liability for the payment of freight charges is based upon the express or implied agreement of the parties to the contract of carriage. Louisville & N. R. Co. v. Central Iron & Coal Co., 265 U.S. 59, 44 S.Ct. 441, 68 L.Ed. 900 (1924).

The federal statutes which may be applicable to the case at bar are 49 U.S.C.A. § 3(2) which provides:

"§ 3, par. (2). Payment of freight as prerequisite to delivery. No carrier by railroad and no express company subject to the provisions of this chapter shall deliver or relinquish possession at destination of any freight or express shipment transported by it until all tariff rates and charges thereon have been paid, except under such rules and regulations as the Commission may from time to time prescribe to govern the settlement of all such rates and charges and to prevent unjust discrimination: . . . Where carriers by railroad are instructed by a shipper or consignor to deliver property transported by such carriers to a consignee other than the shipper or consignor, such consignee shall not be legally liable for transportation charges in respect of the transportation of such property (beyond those billed against him at the time of delivery for which he is otherwise liable) which may be found to be due after the property has been delivered to him, if the consignee (a) is an agent only and has no beneficial title in the property, and (b) prior to delivery of the property has notified the delivering carrier in writing of the fact of such agency and absence of beneficial title, and, in the case of a shipment reconsigned or diverted to a point other than that specified in the original bill of lading, has

also notified the delivering carrier in writing of the name and address of the beneficial owner of the property. In such cases the shipper or consignor, or, in the case of shipment so reconsigned or diverted, the beneficial owner, shall be liable for such additional charges, irrespective of any provisions to the contrary in the bill of lading or in the contract under which the shipment was made. . . . On shipments reconsigned or diverted by an agent who has furnished the carrier in the reconsignment or diversion order with a notice of agency and the proper name and address of the beneficial owner, and where such shipments are refused or abandoned at ultimate destination, the said beneficial owner shall be liable for all legally applicable charges in connection therewith. . . ."

49 U.S.C.A. § 3(3) provides in pertinent part:

"§ 3, par. (3). Liability of shipper-consignee for freight where delivery is made to another party upon instruction. If a shipper or consignor of a shipment of property (other than a prepaid shipment) is also the consignee named in the bill of lading and, prior to the time of delivery, notifies, in writing, a delivering carrier by railroad or a delivering express company subject to the provisions of this chapter, (a) to deliver such property at destination to another party, (b) that such party is the beneficial owner of such property, and (c) that delivery is to be made to such party only upon payment of all transportation charges in respect of the transportation of such property, and delivery is made by the carrier to such party without such payment, such shipper or consignor shall not be liable (as shipper, consignor, consignee, or otherwise) for such transportation charges but the party to whom delivery is so made shall in any event be liable for transportation charges billed against the property at the time of such delivery, and also for any additional charges which may be found to be due after delivery of the property, except that if such party prior to such delivery has notified in writing the delivering carrier that he is not the beneficial owner of the property, and has given in writing to such delivering carrier the name and address of such beneficial owner, such party shall not be liable for any additional charges which may be found to be due after delivery of the property. . . ."

It is Arizona Feeds' position that the foregoing statutes and case law impose responsibility for the freight charges solely upon Moses Lake because of Moses Lake's failure to follow the notification provisions of the statutes. It further contends that in any event Southern Pacific is estopped from collecting from it. We do not agree.

In order to determine the rights and liabilities of the parties we first turn our attention to the bills of lading. Bills of lading on interstate shipments are governed by the Federal Bills of Lading Act, 49 U.S.C.A. § 81 et seq. The bills of lading in question were "straight bills" i. e., the goods were consigned to a specified person. 49 U.S.C.A. § 82. A "straight bill" is not negotiable but it is capable of being assigned. Chesapeake & O. R. Co. v. State Nat. Bank of Maysville, 280 Ky. 444, 133 S.W.2d 511 (1939). The assignee of a straight bill of lading stands in all respects in the shoes of his assignor. Quality Shingle Co. v. Old Oregon Lumber & Shingle Co., 110 Wash. 60, 187 P. 705 (1920).

The consignor-shipper on the bills of lading was Farmer's Union Grain & Feed Co. The consignee was Moses Lake Grain & Livestock Co. Ordinarily, in the absence of any provisions or stipulations to the contrary, a carrier has the right to look for its compensation for its services in transporting goods to the shipper named in the bill of lading or the consignor. Louisville & N. R. Co. v. Central Iron & Coal Co., supra; 13 Am.Jur.2d Carriers § 472 (1964). The bill of lading is a contract between the shipper or con-

signor and the carrier. The consignee may become liable for the freight charges by virtue of either an express or implied contract. American Ry. Express Co. v. Mohawk Dairy Co., 250 Mass. 1, 144 N.E. 721 (1924). The mere designation in the bill of lading of the consignee as the one liable for the freight charges does not create a contractual relationship between the carrier and the consignee, rendering the latter liable therefor, but rather, the consignee becomes liable therefor when an obligation arises on his part from presumptive ownership, acceptance of goods and the services rendered, and the benefits conferred by the carrier for such charges. New York Cent. R. Co. v. Warren Ross Lumber Co., 234 N.Y. 261, 137 N.E. 324 (1922). 49 U.S.C.A. § 3(2) provides that no railroad may deliver any freight until all tariff rates and charges thereon have been paid. This Act imposes upon the consignee who accepts shipment the liability for payment of freight and other charges without regard to any contract. As we shall subsequently discuss this rule is subject to an exception when the bill of lading is marked "prepaid" and the consignee pays the freight to the consignor in reliance on the bill of lading.

The bills of lading in question have the following provision:

"Subject to Section 7 of Conditions of applicable bill of lading, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:

The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

[signature line for consignor.]

If charges are to be prepaid, write or stamp here, 'To be Prepaid'.

[line for stamp.]

Received $. . . . . to apply in prepayment of the charges on the property described hereon. . . ."

None of the foregoing provisions were stamped or signed.

As far as the consignor and consignee are concerned, these bills of lading directed the carrier to deliver the goods to Moses Lake on a collect basis. The phrase "Freight to be Paid by Moses Lake Grain & Livestock Company" in the "Remarks" column did not change the nature of the bills. The consignor was still liable for the freight charges. See cases annotated 24 A.L.R. 1163 (1923); 78 A.L.R. 926 (1932); 129 A.L.R. 213 (1940). Moses Lake's acceptance of delivery would make it liable under the law previously set forth. If the consignor signs the non-recourse provisions it can relieve itself from being compelled to pay any charges if the carrier delivers the goods to the consignee without collecting the charges as directed and the only liability for freight charges incurred by the consignor after he signs such a non-recourse statement is in the event that the goods are not accepted by the consignee upon delivery. New York Cent. R. Co. v. TransAmerican Petroleum Corporation, 108 F.2d 994 (7th Cir. 1939).

Arizona Feeds contends that in spite of the absence of stamping of the prepaid provisions of the bills, the shipment was "prepaid" or "to be prepaid", and if the consignee pays the freight charges to the consignor in reliance on such representation, the carrier is estopped from collecting such charges from the consignee. The authority for that proposition is found in the following cases: Southern Pacific Transportation Company v. Campbell Soup Company, 455 F.2d 1219 (8th Cir. 1972); Missouri Pacific Railroad Company v. National Milling Company, Inc., 409 F.2d 882 (3rd Cir. 1969); Consolidated Freightways Corporation of Delaware v. Admiral Corporation, 442 F.2d 56 (7th Cir. 1971); Griffin Grocery Co. v. Pennsylvania Railroad Co., 93 Ga.App. 546, 92 S.E.2d 254 (1956); Missouri Pacific Railroad Company v. Lake Charles Grain and Grocery Company, 320 F.Supp. 1064 (D.C.1971). See also Note 38 Cornell Law Quarterly 597 et seq. (1953); 17 Wash.Law Rev., 219–220 (1942).

■ Arizona Feeds relies on the testimony of its expert witness, Calvin L. Blaine for the proposition that the shipment was in reality "prepaid" or "to be prepaid". Mr. Blaine is a traffic or transportation consultant whose organization does rate negotiation work for Arizona Feeds and audits its freight bills. He stated that in his opinion the railroad should have complied with the instructions to collect the freight from Moses Lake and the shipment should have been treated on a "to be prepaid" basis. He admitted that customarily the term "to be prepaid" is not used when the consignee is going to pay the charge. He also said that the phrasing used on the bills was "to a certain extent" equivalent to the phrase "to be prepaid". Mr. Blaine's testimony was equivocal and not binding on the trial court as to the legal effect of the words used.

■ The facts in this case simply do not support an estoppel. In the cases applying the doctrine of estoppel we find not only a bill of lading marked "prepaid", but also absence of any initial conduct on the part of the carrier that would indicate to the consignee that the carrier was looking to it for payment. The facts in the case at bench are otherwise. Southern Pacific billed Arizona Feeds for the shipments. Instead of withholding payments to Moses Lake until the freight liability had been cleared up Arizona Feeds sent the bills to Moses Lake and told it to pay them. There was a conflict as to what Arizona Feeds finally told Southern Pacific about the last car. The court chose to believe Southern Pacific's employee who stated that Arizona Feeds told him the bill was "prepaid" and on that basis he told Arizona Feeds to pay Moses Lake. By January 12, 1971, Southern Pacific had sent a letter demanding payment for all of the cars. Attempts by Arizona Feeds to contact Moses Lake were to no avail. Its phone had been disconnected.

■ When Arizona Feeds accepted the bills of lading and delivery of the goods, as an owner, it, as the assignee of Moses Lake stepped into its assignor's shoes. It assumed the position of Moses Lake and agreed to pay for the goods by its acceptance of delivery. Under the terms of the Uniform Bill of Lading prescribed by the Interstate Commerce Commission for Interstate Rail Carriers, the carrier is free either to require the consignor to pay the freight charges in advance, decline to make delivery to the consignee until such charges are paid or guaranteed, or if delivery is made to the consignee without payment, to hold consignee liable for all freight charges. Southern Pacific is not responsible for Arizona Feeds' misplaced faith in Moses Lake.

■ The Interstate Commerce Commission has set time limits within which, after delivery, payment for the freight charges must be made. On carload traffic, credit can be extended for 120 hours after delivery. 49 C.F.R. § 1320.1 and § 1320.3 (1972). It would appear from the record that Arizona Feeds was not billed for the fourth car until ten days after delivery and for the fifth car eleven days after delivery. It claims that Southern Pacific's failure to obey the regulations estopped it from collection of the freight. We do not agree. The purpose of the credit extension limitation imposed by the Interstate Commerce Commission is to prevent discrimination and not to benefit the consignee. Consolidated Freightways Corporation of Delaware v. Eddy, 513 P.2d 1161 (Or.1973).[1]

■ We now turn our attention to Arizona Feeds' argument that 49 U.S.C.A. § 3(2) and § 3(3), relieve it of liability for payment of freight charges. Specifically, it claims that when Moses Lake diverted the cars of barley it failed to notify the carrier as set forth in those statutes. This failure, contends Arizona Feeds, rendered Moses Lake liable for the freight charges, and exonerated Arizona Feeds. We do not agree. A history of the notification provisions of the statutes in question is contained in Northwestern Pacific Railroad

1. Compare Aero Mayflower Transit Company v. Harbin, 126 Ga.App. 72, 190 S.E.2d 91 (1972).

Company v. Burchwell Company, Inc., 349 F.2d 497 (5th Cir. 1965); Union Pacific Railroad Company v. Hall Lumber Sales, Inc., 419 F.2d 1009 (7th Cir. 1969) and 49 Yale Law Journal 1457–1462. These sources indicate that the purpose of the notification provisions was to permit a consignee, when acting only as an agent, to avoid liability from the acceptance of delivery or an act of dominion over the goods, by giving the appropriate written notice specified by the statute.

■ Sections 3(2) and 3(3) of the Interstate Commerce Act impose liability for freight charges on the diverting consignee unless he gives in writing, accurate information of the nature of agency and the beneficial ownership of the goods. The *Burchwell* case, supra, makes it clear that *both* the original consignee and the new consignee can be held liable for the freight. The *Hall Lumber Sales, Inc.* case, supra, clearly states that "a consignee or reconsignee [who does not give the notice] who takes delivery is liable for the charges then billed even if not collected." We see no intention on the part of Congress to relieve the accepting owner from payment of freight charges if the diverting consignee does not give the proper notice. Arizona Feeds cites Pennsylvania Railroad Company v. Greene, 173 F.Supp. 657 (Ala.1959), which discusses § 3(3) as authority to the contrary. We find the statements in *Greene* to be dicta and unsupported by case and statutory law. Its applicability in the case *sub judice* is doubtful. § 3(3) is designed for consignors. As is stated in the *Hall Lumber Sales, Inc.* case, supra:

"The only legislative discussion of section 3(3) indicates that it was designed to relieve consignors who consign to themselves and later reconsign where instructions to the carrier to collect before delivery are disobeyed." p. 1013 of 419 F.2d.

■ Arizona Feeds contends that it should have been granted a judgment for involuntary dismissal at the end of Southern Pacific's case since the carrier never proved that it had not been paid for the freight charges by someone else. Our examination of the pretrial does not disclose this to have been an issue in the case. The burden was on Arizona Feeds to plead and prove payment. It never did so, and its contention is spurious.

■ There is a further claim by Arizona Feeds that the court erred in quashing its subpoena duces tecum at trial. The subpoena called for Southern Pacific's copies of the bills of lading. Arizona Feeds, however, had its own copies of the bills of lading which it introduced at trial. Its apparent purpose was to show that Southern Pacific had the bills of lading in its possession when the deliveries were made and were therefore charged with notice of its terms. Assuming for the sake of argument, that the court erred in quashing the subpoena, we find no prejudicial error in view of the findings of the trial court, its conclusions of law and our reasoning on appeal.

■ Finally, Arizona Feeds claims that the court erred in allowing prejudgment interest. Prejudgment interest is not allowed on unliquidated claims. American Eagle Fire Ins. Co. v. Van Denburgh, 76 Ariz. 1, 257 P.2d 856 (1953). It is argued that Southern Pacific's claim is unliquidated because (1) there was a dispute as to the amount and (2) Southern Pacific's initial claim was in excess of the tariffs and when appellant's traffic consultant became involved in the case ". . . plaintiff tacitly acknowledged it had previously claimed an excessive rate and tariff." This contention is without merit. Southern Pacific's claim is for freight charges established as a matter of law by published tariffs. 49 U.S.C.A. § 6. They are capable of mathematical computation and are thus liquidated claims. L. M. White Contracting Company v. St. Joseph Structural Steel Company, 15 Ariz.App. 260, 488 P.2d 196 (1971).

Affirmed.

HATHAWAY, C. J., and KRUCKER, J., concur.