[No. 29021. Department One. July 7, 1943.]

STOUFFER-BOWMAN, INC., *Respondent,* v. H. W. WEBBER, *Defendant,* PROCESSED-WOODS, INC., *Appellant.*[1]

[1]Reported in 139 P. (2d) 717.

*Warner Poyhonen* and *Hogan & Adams,* for appellant.

*Lester T. Parker,* for respondent.

JEFFERS, J.—Plaintiff, Stouffer-Bowman, Inc., a corporation, instituted this action against H. W. Webber and Processed-Woods, Inc., a corporation, to foreclose a lien for materials furnished by plaintiff and alleged to have been used in the repair of a building owned by defendant Processed-Woods, Inc. It is alleged in the complaint that the materials were furnished between July 6, 1939, and September 22, 1939, at the special instance and request of H. W. Webber, as agent for Processed-Woods, Inc. Defendant Webber apparently never was served with summons and complaint, and did not appear.

Defendant Processed-Woods, Inc., by its answer, denied that any material was furnished by plaintiff to H. W. Webber as its agent, and admitted the ownership of the property described in the complaint. Defendant alleged affirmatively that, if plaintiff furnished any materials to be used in the construction, alteration, and repair of the building described in the complaint, the same was done without the knowledge, consent, or ratification of defendant, or any agent of defendant. It is further alleged that defendant received no notice of the delivery of materials, as provided by Rem. Rev. Stat., § 1133 [P. C. § 9706].

Plaintiff, by its reply, denied the affirmative matter contained in defendant's answer.

The cause came on for hearing before the court, which thereafter made and entered findings of fact, conclusions of law, and judgment. We desire to set out certain of the findings made by the trial court, upon which its conclusions and judgment were based.

Finding No. 2: "That between the dates of July 6, 1939, and September 22, 1939, the plaintiff at the special instance and request of the defendant H. W. Webber sold and delivered certain building materials for use in remodeling and repairing certain premises owned by the defendant located on the following described property [description of property]."

Finding No. 3: "That the said H. W. Webber prior to the commencement of these deliveries had been the manager of the defendant corporation and had charge of said property, that four months prior to the time said goods were delivered by the plaintiff upon the premises, the said H. W. Webber was no longer an officer or manager of defendant corporation but had been permitted to have control of said premises and did represent himself to the plaintiff as an officer of the defendant corporation and ordered said materials billed to a concern to be known as North Coast Packing Company who had leased said premises from defendant Processed Woods, Inc., but represented to plaintiff that he, Webber, represented the owner of the property upon which the goods were to be delivered. That plaintiff had made no previous sale to defendant Processed Woods, Inc., and said defendant had no knowledge that Webber was representing himself as agent of Processed Woods, Inc."

Finding No. 4: "That the defendant corporation did not, prior to the delivery of said materials, file with the county auditor, as provided by law, a list of its officers and did not file any notice of any kind as to who its stockholders were or who its officers were. That H. W. Webber was one of the organizers and promoters of said corporation when it was organized and was generally known in the community as an officer and as one of the principal stockholders of said corporation. That no notice of any kind was given that the said H. W. Webber had ceased to be an officer of said corporation."

Finding No. 5: "That the materials furnished by the plaintiff were all used in repairing and remodeling of said buildings and by reason thereof the defendant Processed Woods received several months rent upon said premises and the benefit of said materials."

Finding No. 9: "That the defendant Processed Woods, Inc., had no telephone listed in any telephone directory and was not listed in the city directory of the city of Aberdeen at the time the said materials were furnished. That plaintiff relied upon the representations of Webber that he represented the Processed Woods, Inc., in making said sales."

The court concluded that plaintiff was entitled to a decree against defendant, foreclosing its lien upon the premises for $691.59, together with interest and attorney's fees of seventy-five dollars. A decree was entered December 4, 1942, and this appeal by defendant Processed-Woods, Inc., followed.

The assignments of error are as follows: The evidence was wholly insufficient to sustain the findings and judgment of the court impressing a materialman's lien upon appellant's property, and the court erred in entering judgment in favor of respondent and against appellant, and in refusing to dismiss the action as against appellant.

■ Respondent has moved to dismiss this appeal, for the reason that no appeal bond was filed within the time provided by law. The judgment in this case was signed and filed on December 4, 1942. Notice of appeal was served and filed on January 4, 1943. January 3, 1943, which would have been the last day for giving notice of appeal, was Sunday, and this gave appellant until the following day, or January 4th, to serve its notice of appeal. The appeal bond was filed January 9, 1943.

Respondent contends that the extreme limit for filing an appeal bond is thirty-five days from the date of judgment, where the appeal is filed on the last day. We cannot agree with respondent's contention. The notice of appeal was timely served and filed on January 4, 1943, and the filing of the appeal bond on January 9th literally complied with Rem. Rev. Stat., § 1721 [P. C. § 7295], which provides:

"An appeal in a civil action or proceeding shall become ineffectual for any purpose unless at or before the time when the notice of appeal is given or served, or within five days thereafter, an appeal bond to the adverse party conditioned for the payment of costs and damages as prescribed in section 1722, be filed with the clerk of the superior court. . . ."

The motion is denied.

Harold Stouffer, president of respondent corporation, who had charge of the transaction involved herein, and who was the only person connected with respondent to testify, stated:

"Q. Were you acquainted with a man by the name of Webber? A. Yes. Q. When did you first become acquainted with him? A. I became acquainted with him probably a couple of years before, so far as I can remember, about two years before—during 1938. Q. Do you know what he was doing at that time? A. He was selling stock for the Processed Woods Company. The first time I met him was at the Becker Building, and at that time he got me up there to try and interest me in buying some stock in the Processed Woods. Q. Was he at that time claiming to represent the Processed Woods? A. He claimed he was the organizer, and controlled the basic patents for them, the method by which they intended to process woods. Q. At any later date did you have any dealings with Webber with reference to the sale of merchandise for which this action is brought? A. He and Fisher came into the office and Webber advised that Fisher had leased part of the building, and that he was representing the owners of the building, Webber was, and Fisher was representing the North Coast Packing Company and any material we sold them the invoice was to be mailed to Fisher in Tacoma, and he would pay the same for the North Coast Packing Company, and we would mail a copy of that invoice to Webber, who would represent the Processed Woods Company.

[We desire at this point to call attention to the last statement of Mr. Stouffer, which shows that any material to be furnished was to be furnished to Fisher, representing the North Coast Packing Company, and that Fisher would pay for same.]

"Q. Did you do that? A. Yes. Q. Did you sell a quantity of merchandise under that arrangement? A. We did. Q. And was any of it paid for? A. The total there was $841. Q. The amount we are suing for here? A. Yes, the first six or eight invoices were paid for as soon as we mailed the invoices to Tacoma we would get a check back. Q. Fisher lived in Tacoma, did he? A. Yes. Q. I hand you here a list of invoices and list of delivery slips and ask you whether or not these in-

voices and delivery slips are for the amount of merchandise sued upon in this action? A. Yes, and the statements cover all of which has not been paid. . . .

[These invoices, which were introduced in evidence, all show the material was sold to North Coast Products or Packing Company. The first one is dated July 6, 1939, and the last one September 16, 1939.]

"Q. That shows a balance of $841.59. Was there anything paid on that? A. We accepted a note for $150.00 from the North Coast Packing Company, signed by Mr. Fisher. . . . Q. Now, Stouffer, were you out at the place where these materials were delivered while there was work going on? A. I went out there every day, two or three times. Perhaps not every day, but I went out there and seen the work as it was progressing, at all times. Q. Were all the materials, covered by your claim and by the invoices in evidence, used in that particular building? A. Yes."

The notice of claim of lien was then identified and introduced. This notice was filed December 19, 1939, and shows that respondent began to furnish materials on July 6, 1939, at the request of H. W. Webber, as agent for Processed-Woods, Inc., and that respondent ceased furnishing materials on September 22, 1939.

We quote further from Mr. Stouffer's testimony on cross-examination:

"Q. You personally talked to Webber? A. Yes. Q. And to Mr. Fisher? A. Yes. Q. To anyone else? A. No. Q. Did you at any time talk to anyone other than Webber and Fisher? A. No. Q. What did Fisher tell you his connection was? A. Well, he was organizing the North Coast Packing Company, who was leasing part of the building from the Processed Woods. Q. Do you know what their line of work was to be? A. They were going to can tuna fish of some kind. Q. And they wanted these materials for the purpose of making alterations that would adapt the plant to the processing of fish? A. Yes. . . . Q. Did you ever make inquiry as to how much stock in Processed Woods Webber owned? A. He told me he owned the controlling stock. Q. Your only information was what Webber told you? A. Yes, and there was no other address of the Processed Woods. . . . Q. Do you

know now what amount of stock Webber owned in Processed Woods? A. No, I do not. Q. Do you know whether he was ever a director? A. As I told you, about a year prior to the date I sold this material I was introduced to him by Mumaw, who took me up to the office of the Processed Woods and Webber attempted then to sell me stock in the Processed Woods. Q. Did you ever make an investigation as to whether or not Webber was a director in Processed Woods? A. No, I didn't. Q. Did you ever make an investigation? A. No, I didn't. Q. Do you know now whether or not he was ever a director in Processed Woods? A. No, not from any authentic record, I was never able to find out. Q. Your conclusion that you have arrived at, was from your personal conversations with Webber? A. And Mumaw. Q. And through no other source? A. That's correct. Q. Do you know who the directors are of Processed Woods? A. No. Q. Do you know whether or not Webber resigned as manager of Processed Woods some three months prior to the time that you started to furnish materials? A. No, I do not. . . . Q. Have you had any dealing whatsoever, in the past, with Processed Woods? A. Nothing only as I mentioned, they were trying to sell me stock. Webber. Q. You never sold any goods to Processed Woods? A. I don't believe we ever have. Q. So when Webber and Fisher came to see you, it was a new account? A. That's correct."

Andrew Hilliard, president of Processed-Woods, and who had held such position since the corporation was organized in 1937, testified that Webber was operating manager. It does not appear what his duties were, but Mr. Hilliard testified he had no authority to purchase anything for Processed-Woods, unless agreed upon by the board of directors, and, as stated, it does not appear that Webber ever did purchase anything. It appears without dispute that Webber resigned from, and severed all connection with, Processed-Woods on March 1, 1939.

It is not contended that Processed-Woods or any of its officers knew anything about the Webber-Fisher deal with respondent, or knew of the materials being

furnished by respondent. It is admitted that respondent did not notify appellant that it had begun to furnish materials to be used on its building, as provided by Rem. Rev. Stat., § 1133.

In regard to the lease which was entered into with Mr. Fisher, Mr. Hilliard testified:

"Q. Will you explain to the court the circumstances under which this lease with M. D. Fisher was entered into? A. Well, the first one that started this lease was Webber and Fisher were in it together, and I don't know the reason for placing the lease in Fisher's name, but I do know that Webber signed the checks and the bank account in the company was in his personal name, in a bank in Hoquiam. That is the North Coast Packing Company. . . . Q. You understand that Webber was one of the promoters of the North Coast Packing Company? A. He was. Q. Do you know in what capacity he was interested in that venture? A. To my knowledge he ran the whole works. . . . Q. Mr. Webber, at the time this lease was negotiated, was not in your employment? A. No. Q. And he was at that time representing other parties, parties other than Processed Woods? A. He was representing the North Coast Packing Company."

The lease in question was entered into between Processed-Woods, Inc., and M. V. Fisher, on June 14, 1939, which was before respondent had furnished any materials. We desire at this point to call attention to one provision of the lease, which is as follows:

"It is understood and agreed that the said lessee shall have full right and power to make such additions, alterations and changes in said portion of the building to be occupied by him as are necessary and incidental to his proper use of said building in the canning, processing and smoking of seafoods and other products."

The lease was to terminate on January 15, 1944.

It appears that Processed-Woods, Inc., had been inactive for some time prior to the time the lease was made, and that nothing was being done by appellant in the building. W. J. Martin, secretary of the com-

pany, testified that he thought the building was locked. It does not appear that after March 1, 1939, Webber was authorized to do anything for appellant, in or around the building, or that appellant knew that he was there claiming to represent appellant in any way.

It appearing conclusively from the testimony, and the court having found, that Webber had severed his connections, whatever they may have been, with appellant corporation some four months before Webber and Fisher contacted respondent in regard to the materials claimed to have been furnished, and it further appearing from the testimony, and the court having found, that appellant had no knowledge that Webber was representing himself as agent of appellant, and it further appearing from the testimony, and the court having found, that respondent had made no previous sale to appellant, it is apparent that Webber was not specifically or generally authorized to represent and bind appellant. Webber's representations were not sufficient to establish agency.

In *Ennis v. Smith,* 171 Wash. 126, 18 P. (2d) 1, we stated:

"We are committed to the rule that the mere declarations of an alleged agent, made out of court, are not competent testimony to establish the fact of his agency: that, where there is no evidence from which the fact of agency may be inferred, the declarations of the agent as to facts tending to establish the agency, even when made as a part of the *res gestae,* are inadmissible."

The judgment cannot be sustained upon the theory that Fisher, as lessee, was the agent of appellant, or that Webber, because of his interest in the lease, or because he may have had charge of the alterations of the building, was the agent of appellant, as in either case neither Fisher nor Webber would have been more than a statutory agent, and it would have been necessary for respondent to give the five-day no-

tice required by Rem. Rev. Stat., § 1133, which provides:

"Every person, firm or corporation furnishing materials or supplies to be used in the construction, alteration or repair of any . . . building . . . shall, not later than five (5) days after the date of the first delivery of such materials or supplies to any contractor or agent, deliver or mail to the owner or the reputed owner of the property, on, upon or about which such materials or supplies are to be used, a notice in writing, stating in substance and effect that such person, firm or corporation has commenced to deliver materials and supplies for use thereon, with the name of the contractor or agent ordering the same. . . . No materialman's lien shall be enforced unless the provisions of this act have been complied with."

In the case of *Colby & Dickinson v. McCulloch*, 145 Wash. 561, 261 Pac. 86, we held that the word "agent," used in Rem. Comp. Stat., § 1133 (Rem. Rev. Stat., § 1133), seemed to refer back to Rem. Comp. Stat., § 1129, which made every contractor, subcontractor, architect, builder, or person having charge of the construction, alteration, or repair of any property subject to the lien provided for by the section, the agent of the owner for the purpose of the establishment of the lien created by the statute. In the cited case, we stated:

"Therefore, the statutory notice is required when the purchase is made by a statutory agent, but not when made by a non-statutory agent of the owner."

We then quoted from the syllabus in the case of *Spokane Valley Lbr. & Box Co. v. Dawson,* 94 Wash. 246, 161 Pac. 1191, as follows:

" 'Where materials are furnished to the owner upon the order of the owner's general agent in full control and management of the lands, it is not necessary to give the owner the five days' written notice of the delivery of the materials provided for by Rem. Code, § 1133.' "

In the case of *Miles v. Bunn,* 173 Wash. 303, 22 P. (2d) 985, we held that whether or not a lessee of real

estate, in constructing improvements, acts as the agent of the owner of the land, under the statute upon the subject of the lien for labor and materials, depends upon whether the lessee, under the terms of the lease, has a privilege, merely, or is obligated to construct improvements. In the cited case, we quoted from the case of *Stetson-Post Mill Co. v. Brown*, 21 Wash. 619, 59 Pac. 507, 75 Am. St. 862, as follows:

" 'We have held that the construction of a building by a lessee upon land held by him as lessee, in pursuance of a mere lease contract privilege so to do, does not, under these statutory provisions, constitute such lessee the agent of such lessor owner so as to effectually charge the land with lien claims of mechanics and materialmen furnishing labor and material for the construction of such building.' "

It must have been the theory of the trial court, and it is the theory of respondent, that the facts in the instant case were such as to estop appellant from questioning the authority of Webber, as its general agent, to represent it in this transaction.

Respondent states in its brief that notice to Webber was notice to appellant; that Webber had been the general manager and vice-president of appellant, and as such he was the general agent, as distinguished from the statutory agent. Respondent refers to the case of *Colby & Dickinson v. McCulloch, supra,* to which we have heretofore called attention, and then states:

"The question then is whether or not under the circumstances of this case the appellant corporation is estopped from claiming that Webber was not still the manager of the company, or has waived its right to notice as provided for in this section [Rem. Rev. Stat., § 1133]."

In 19 Am. Jur., p. 642, § 42, we find the following relative to equitable estoppel:

"The essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of

material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially."

▃▃ Estoppels must be certain to every intent, and are not to be taken as sustained by mere argument or doubtful inference. No party ought to be precluded from making out his case according to its truth unless by force in some positive principle of law. Hence, the doctrine of estoppel *in pais* must be applied strictly, and should not be enforced unless substantiated in every particular.

▃▃ In the often cited case of *Carruthers v. Whitney*, 56 Wash. 327, 105 Pac. 831, Justice Dunbar, writing the opinion for the court, stated:

"Estoppel is an equitable proceeding, or speaking more accurately perhaps, it is the equitable result of a wrongful proceeding or act, a reliance upon which would, in the absence of an estoppel, work an injustice to an innocent person. At the common law estoppel was founded on deeds and records of courts, but estoppel in equity is estoppel *in pais*. The principle now applies because it has been found that the common law rule was too narrow and inadequate for the attainment of justice under the multiplied transactions of modern times, and hence the equitable estoppel of the present day. The well-understood idea of equitable estoppel is that, where a person wrongfully or negligently by his acts or representations causes another who has a right to rely upon such acts or representations to change his condition for the worse, the party making such representations shall not be allowed to plead their falsity for his own advantage."

The above rule was cited with approval in the case of *Bennett v. Grays Harbor County,* 15 Wn. (2d) 331, 130 P. (2d) 1041. See, also, the case of *Strand v. State,* 16 Wn. (2d) 107, 132 P. (2d) 1011, wherein the two cases last above referred to are cited, and the rule as to equitable estoppel, found in 21 C. J. 1113, § 116, is quoted.

■ What facts are shown herein, upon which respondent bases estoppel?

Respondent states:

"It must be kept in mind that Webber, while he was vice-president and manager of the company, had previously dealt with Mr. Stouffer, president and sole owner of Stouffer-Bowman Company, in matters relating to the corporation."

The above reference is to the time Webber attempted to sell Mr. Stouffer stock in appellant company. It does not appear from the evidence that Webber stated to Mr. Stouffer that he (Webber) was vice-president and manager of appellant company at the time of the attempted stock sale, or at the time he and Fisher contacted Mr. Stouffer in regard to the furnishing of the material here in question, or that Mr. Stouffer ever knew that Webber was manager and vice-president. Therefore, whether Webber was or was not manager and vice-president of appellant could not have influenced Mr. Stouffer in the transaction in the present case. All that Mr. Stouffer claims to have relied upon is his former meeting with Webber, when the latter told him that he was the organizer of appellant company, and controlled the basic patent by which the company intended to process woods.

We may state further that there is no evidence which shows that Webber was ever the general manager of appellant company, and had charge of its property. Mr. Hilliard, who has been president of the company since it was organized, testified that Webber was operating manager. Mr. Hilliard further testified that

Webber was never a member of the board, and never had the right to purchase anything, unless the board had agreed to it. It does not appear that Webber did in fact ever purchase anything for appellant company. In fact, in so far as the record shows, the only occasions on which Webber purported to represent appellant in any transaction were when he attempted to sell stock to Mr. Stouffer, and in the instance now before us.

We are unable to find any evidence in the record which would justify the finding that Webber was generally known in the community as an officer and one of the principal stockholders of appellant.

Respondent further states:

"It must be also kept in mind that even though Webber had resigned as manager, he was permitted to keep control and possession, as far as the public knowledge was concerned, of the corporation property upon which these materials were delivered."

While it may be true that Webber had in fact been in control of the property here in question prior to his resignation, there is nothing in the record to so show, or to show that respondent, prior to the time it delivered the material here in question, knew that Webber had been in control of appellant's property, or that Mr. Stouffer relied on this fact at the time of selling the material. Neither does it appear that, at the time the material was delivered, when Mr. Stouffer testified he saw Webber there, appellant permitted Webber to have control of the property, or that appellant knew he was claiming to be in control. It is evident from the record that Webber was at the building, representing either Fisher or the North Coast Packing Company.

It appears from the testimony, without dispute, that appellant was not operating in this building. In fact, Mr. Martin testified it was locked, and there was certainly no occasion for appellant to believe that Webber

was at the building, representing appellant in any way.

It further appears without question that the alterations to be made were for the purpose of making the building suitable for the purpose for which the lessee was going to use it, and this fact was known to Mr. Stouffer. It further appears without contradiction that the alterations made by Fisher, instead of being a benefit to appellant, as found by the trial court, were a detriment, and had to be torn out when appellant took possession of the building.

Furthermore, respondent, at the time it claimed to have made the sale at the request of Webber as agent for appellant, could not have relied upon, or been influenced by, what Stouffer afterwards saw of Webber's activities in or around the property.

Respondent also states:

"It must also be kept in mind that the corporation gave no notice of any kind that Webber had ceased to be manager and an officer in the corporation. It must also be kept in mind that the corporation made no attempt to comply with the law which required the filing of its list of officers and that the corporation itself maintained no office and also was not listed in any city directory or telephone directory."

It is admitted that appellant had been dormant for some time. This being true, there was no particular reason that we can see for having its name in either the telephone or city directory.

It is admitted that appellant gave no notice that Webber had severed all his relations with appellant. It may be admitted that, where a corporation has knowingly permitted an officer or its manager to exercise certain authority in representing it, the corporation might thereafter be estopped from claiming that such officer or manager had no such authority as against one who had dealt with him, even though in fact such officer or manager did not have the authority claimed by him. In this record, however, we are unable to see

any acts on the part of Webber which would justify respondent in accepting his statement that he was authorized to represent appellant. Nor does it appear from the record that Webber's activities at any time during his connection with appellant had been such as to justify appellant in believing that it was necessary to give notice that he was no longer connected with the company.

It is true that appellant failed to file a list of its officers and directors, as required by Rem. Rev. Stat. (Sup.), § 3803-32½ [P. C. § 4503-132q], but the only consequence of a failure to comply with the statute is that service of process against such corporation may be made by service upon the secretary of state. We are unable to see that the failure on the part of appellant to file such list, or its failure to have its name in the telephone directory or city directory, in any way tends to support the judgment entered.

It would seem that if anyone was at fault in this case, it was Mr. Stouffer, for he admits that he was unable to get any information to verify the statement made to him by Webber, that he was authorized to represent appellant company, and we are of the opinion, therefore, that Stouffer relied entirely upon the statements made by Webber, which are not in and of themselves sufficient to establish agency.

We have examined the cases cited by respondent, and particularly the case of *Thompson v. O'Leary,* 176 Wash. 606, 30 P. (2d) 661, which presents a factual situation so different from the instant case that it is not applicable here. In the cited case, the materials were furnished to, and the labor performed for, one Travis, who claimed to be a lessee of the premises. We held that the lienor had no knowledge of the lease, either actual or constructive, it never having been recorded. We further held that the lease was only a subterfuge, and was carried around by Travis until after the materials were furnished and the labor per-

formed, and then turned back. The property belonged to James O'Leary. One Crawford was agent for all the O'Leary properties, and both O'Leary and Crawford were frequently on the premises during the time the materials were being furnished and the labor performed. It also appears from the opinion that

"There was also some evidence tending to show that Travis acted by and under the direction of Crawford, the general agent of the O'Learys, in procuring the labor and materials for the improvement of the property."

We are clearly of the opinion that Webber was neither the general nor special agent of appellant, and had no authority to represent or bind appellant in this transaction with respondent, and we are further of the opinion that the facts fall far short of meeting the rules under which appellant would be estopped from denying Webber's authority.

Webber being neither the special nor general agent of appellant, respondent would not be entitled to a lien on appellant's property, in any event, unless it had given to appellant the five days' notice required by § 1133, *supra*.

The judgment of the trial court is reversed, with instructions to dismiss the action as to appellant, Processed-Woods, Inc.

SIMPSON, C. J., MILLARD, STEINERT, and MALLERY, JJ., concur.