[No. 9226–0–I. Division One. August 10, 1981.]

ALASKA MARINE TRUCKING, *Respondent,* v. CARNATION
COMPANY, *Appellant.*

*Reaugh, Hart, Allison, Prescott & Davis, Keith R. Baldwin, Helsell, Fetterman, Martin, Todd & Hokanson, Richard S. White,* and *Linda Cochran,* for appellant.

*Aiken, St. Louis & Siljeg* and *Douglas W. McQuaid,* for respondent.

SWANSON, J.—The Carnation Company appeals a judgment in favor of Alaska Marine Trucking (AMT) for $91,100.82 in freight charges. Alaska Marine Trucking cross–appeals the trial court's conclusion of law that it would be estopped from collecting at least part of the freight charges under ordinary rules of equity.

For about 25 years, Carnation sold dairy products to Meadowmoor Alaska Dairy (Meadowmoor). Carnation shipped these products to Meadowmoor in Alaska via interstate carriers designated by Meadowmoor. By 1977, Meadowmoor had become a bad credit risk. It owed Carnation a considerable amount of money so that Carnation arranged for payment of its goods prior to delivery to Meadowmoor.

About November 1977, Meadowmoor's new owner, Gil D'Amato, designated AMT as the carrier for consolidated shipments from Seattle/Tacoma to Alaska. AMT did not make a credit check on Meadowmoor before it started shipping for Meadowmoor. Because Meadowmoor was on the Transport Clearing[1] nonpurchase list, AMT billed Meadowmoor directly within 7 days of delivery in accordance with ICC regulations, 49 CFR § 1322.1 and § 1322.3.

In December 1977, Carnation began shipping to Mea-

---

[1]Transport Clearing (now called Tradex) bills customers of member freight carriers for transportation services. As a member of Transport Clearing, AMT agreed to sell its freight bills to Transport Clearing except for AMT customers on the nonpurchase list.

dowmoor via AMT. For each shipment, a Carnation employee completed a standard bill of lading which became the contract between Carnation and AMT. Carnation designated the shipments as freight collect,[2] but it did not fill in the section 7 nonrecourse provision.[3]

Meadowmoor immediately fell behind in paying AMT for freight charges. Despite only a minor dispute over freight charges which AMT corrected by the middle of February, by the end of the month Meadowmoor owed $139,475.51. The unpaid charges reached over $158,000 by the end of March. On March 3, AMT wrote Meadowmoor requesting an immediate payment of at least $25,000 on the delinquent account. Meadowmoor did pay about $61,000 against the account during March. On March 31, 1978, AMT by letter proposed a payment schedule to bring Meadowmoor current by May 1, 1978. However, AMT placed Meadowmoor on driver collect[4] the next day. Shortly thereafter, Meadowmoor switched to another carrier. On April 8, 1978, AMT first advised Carnation of Meadowmoor's delinquent account, for which Carnation would still be liable.[5] On April 12, Carnation began signing the section 7 nonrecourse provision on all bills of lading for shipments to Meadowmoor.

---

[2]Freight collect means the consignee undertakes to pay freight charges which are due and payable within 7 days of receiving the invoice. The shipper still remains responsible for the freight charges. Carnation believed freight collect placed all responsibility for freight charges on the consignee.

[3]By signing the nonrecourse provision, the shipper places all responsibility for freight charges on the consignee. The bills of lading provided: "Subject to Section 7 of conditions of applicable bill of lading, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement: 'The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.'"

[4]Under driver collect, the consignee must pay freight charges to the delivering carrier before that carrier will release a shipment.

[5]Carnation claimed it would have taken steps to protect itself from liability if it had been notified earlier. However, signing the nonrecourse provision was apparently its only change in dealing with AMT after April 12.

Carnation continued to supply dairy products to Meadowmoor until the middle of May 1978. By a formal certified letter dated July 11, 1978, AMT demanded payment of the outstanding freight charges on the Meadowmoor account from Carnation. AMT then sued Carnation on July 25, 1978. Meadowmoor filed for bankruptcy on September 5, 1978. Meadowmoor is insolvent and has no assets available to meet the freight charges owed.

The trial court in determining liability for the freight charges awarded AMT a judgment for $91,100.82 against Carnation. It concluded as a matter of law that Carnation would have an equitable estoppel defense for at least part of these charges under ordinary equitable principles.[6] However, it stated that the great weight of authority prohibited the application of equitable principles to this case.

Carnation contends that estoppel does apply to this case to relieve it from liability. It also argues that surety law absolves it from liability because it claims AMT made a binding agreement with Meadowmoor to extend the time for payment of the freight charges without informing Carnation as surety, causing the surety's discharge.

■■ The standard bills of lading completed by Carnation and accepted by AMT constitute the contracts between these two parties. *Transport Clearing Northwest v. Bardahl Mfg. Co.*, 22 Wn. App. 568, 589 P.2d 1242 (1978). Federal law governs the interpretation of bills of lading used for interstate shipments. *Illinois Steel Co. v. Baltimore & O. R.R.*, 320 U.S. 508, 88 L. Ed. 259, 64 S. Ct. 322 (1944). A freight consignor who does not sign the nonrecourse provision of the standard bill of lading remains liable to the carrier for all lawful charges. *Illinois Steel Co. v. Baltimore & O. R.R., supra.* Therefore, in the absence of

---

[6]However, the trial court made no fact findings on the elements of estoppel. Because the facts of the case are essentially undisputed, we must treat the issue of estoppel as a question of law. *See, e.g., Boston & M. R.R. v. Hannaford Bros. Co.*, 144 Me. 306, 68 A.2d 1, 7 (1949). Thus, we are not bound by the trial court's conclusion on the estoppel issue.

estoppel or release, Carnation would be liable for the freight charges.

There are two major lines of cases which discuss the application of equitable estoppel defenses to freight charges—undercharge cases and double payment cases. In the undercharge cases where the carrier has charged less than the published, legally payable tariff rate, estoppel is not available as a defense when the carrier demands the full tariff. *See, e.g., Louisville & N. R.R. v. Central Iron & Coal Co.,* 265 U.S. 59, 65, 68 L. Ed. 900, 44 S. Ct. 441 (1924); *Pittsburgh, C., C. & St. L. R.R. v. Fink,* 250 U.S. 577, 582–83, 63 L. Ed. 1151, 40 S. Ct. 27 (1919). These decisions disallow estoppel to provide uniformity in charges for freight services under the Interstate Commerce Act and, thereby, to prevent rate discrimination. *See, e.g., Midstate Horticultural Co. v. Pennsylvania R.R.,* 320 U.S. 356, 361, 88 L. Ed. 96, 64 S. Ct. 128 (1943); *Illinois Cent. Gulf R.R. v. Golden Triangle Wholesale Gas Co.,* 586 F.2d 588, 592 (5th Cir. 1978). In the double payment cases, where goods are shipped under prepaid bills of lading so that the consignee, relying on this representation of prepaid freight charges, pays the consignor for the goods including freight charges, the defense of estoppel is available to the consignee against the carrier to prevent double payment liability for the consignee. *See, e.g., Southern Pac. Transp. Co. v. Campbell Soup Co.,* 455 F.2d 1219 (8th Cir. 1972); *Consolidated Freightways Corp. v. Admiral Corp.,* 442 F.2d 56 (7th Cir. 1971); *Missouri Pac. R.R. v. National Milling Co.,* 409 F.2d 882 (3d Cir. 1969).

■ The present case involves neither an undercharge for services performed nor a potential double payment liability for the consignee. Instead the case concerns the liability of a consignor (Carnation) for freight charges on freight collect shipments because the bankrupt consignee (Meadowmoor) is insolvent and the carrier negligently failed to collect or to inform the shipper of the overdue account until it became seriously delinquent. In determining if the defense of estoppel is available in a freight rate case, this

court in *Lyon Van Lines, Inc. v. Cole,* 9 Wn. App. 382, 387, 512 P.2d 1108 (1973), quoting *Consolidated Freightways Corp. v. Admiral Corp., supra* at page 62, stated:

The crucial question is not whether estoppel is urged as a bar to collection of the tariff rate as such, but whether the use of estoppel to prevent recovery on the facts of the particular case contradicts the statutory policy of Section 223 [49 U.S.C. § 323, now 49 U.S.C. §§ 10743, 10744] to curb discriminatory treatment of shippers.

*Accord, Union Pac. R.R. v. Stadelman Fruit, Inc.,* 13 Wn. App. 824, 827, 537 P.2d 1076 (1975); *see Southern Pac. Transp. Co. v. Campbell Soup Co., supra.* There is no question of possible preferential treatment for one consignor over another in the instant case. Thus, under the facts of this case, the use of an estoppel defense by Carnation to prevent recovery by AMT as carrier does not contravene the antidiscriminatory purposes of the Interstate Commerce Act. Therefore, the trial court should have allowed the application of Carnation's estoppel defense.

██ Equitable estoppel arises when one wrongfully or negligently, by acts or representations, causes another who has a right to rely on such acts or representations to change position to its detriment.[7] *State v. Charlton,* 71 Wn.2d 748, 751, 430 P.2d 977 (1967). The burden of proving estoppel and the material facts to support estoppel is on the party claiming estoppel. *State v. Charlton,* at 751; *Stouffer–Bowman, Inc. v. Webber,* 18 Wn.2d 416, 139 P.2d 717 (1943).

Carnation asserts it has shown the necessary elements of estoppel because it claims (1) AMT extended credit to Meadowmoor in violation of Interstate Commerce Commission regulations without informing Carnation, (2) Carnation

---

[7]The elements of estoppel are also commonly described as (1) an admission, statement, or act inconsistent with a claim afterwards asserted, (2) an action by the other party on the faith of such admission, statement, or act, and (3) an injury to the other party if the claimant is allowed to contradict or repudiate the earlier admission, statement, or act. *Liebergesell v. Evans,* 93 Wn.2d 881, 889, 613 P.2d 1170 (1980); *Arnold v. Melani,* 75 Wn.2d 143, 147, 437 P.2d 908 (1968).

rightfully relied on its belief that AMT would collect the freight charges within 7 days of invoicing, and (3) Carnation was injured by relying on this belief in that it continued to ship products to Meadowmoor, allowing even more freight charges to accrue.

However, Carnation has failed to prove estoppel because it has not shown that it rightfully relied on AMT's credit practices. As Carnation's general sales manager, Wayne Boynton, admitted, he thought by shipping freight collect that Carnation had placed all responsibility for freight charges on Meadowmoor. Carnation's shipping clerk in charge of the shipments to Meadowmoor also admitted she was unaware of the section 7 nonrecourse provision on the bills of lading until about April 12, 1977. Carnation then relied on its own choice of shipping "freight collect" to limit its liability, not on AMT's credit practices. Moreover, the Interstate Commerce Commission credit rule requiring payment of freight charges within 7 days was designed to prevent carriers from discriminating against customers. *United States v. Pennsylvania R.R.,* 308 F. Supp. 293, 297 (E.D. Pa. 1969); *United States v. General Expressways, Inc.,* 270 F. Supp. 115, 117 (D. Colo. 1967); *Arizona Feeds v. Southern Pac. Transp. Co.,* 21 Ariz. App. 346, 519 P.2d 199, 207 (1974); *Consolidated Freightways Corp. v. Eddy,* 266 Or. 385, 513 P.2d 1161, 1166 (1973). Violation of the rule would not affect the issue of liability. *AAA Trucking Corp. v. Spherex, Inc.,* 110 N.H. 472, 272 A.2d 594, 595 (1970); *East Tex. Motor Freight Lines v. Franklin County Distilling Co.,* 184 S.W.2d 505, 507 (Tex. Civ. App. 1944). The carrier, AMT, did not have a duty to notify Carnation immediately of the failure of Meadowmoor to pay the freight charges when due, and want of such notice is no defense.[8] *Long Island R.R. v. Midland Valley Lumber Co.,* 237 Mo. App. 147, 164 S.W.2d 930, 933 (1942), and cases

---

[8]An estoppel by silence cannot exist unless the party to be estopped has some duty to disclose that which is claimed as the basis for the estoppel. *Pacific Nat'l Bank v. Richmond,* 12 Wn. App. 592, 596, 530 P.2d 718 (1975).

cited therein; *but see Brown Transp. Corp. v. Atcon, Inc.,* 144 Ga. App. 301, 241 S.E.2d 15, 16 (1977), *cert. denied,* 439 U.S. 1014, 58 L. Ed. 2d 687, 99 S. Ct. 626 (1978) (requiring carrier to bill consignor within 7 days of delivery on freight collect shipment to maintain consignor's potential liability for freight charges). Consequently, Carnation did not show that it rightfully relied to its detriment on acts or representations by AMT. Thus, Carnation failed to prove the defense of estoppel. *Cf. Arnold v. Melani,* 75 Wn.2d 143, 147, 437 P.2d 908 (1968) (elements of estoppel not established by facts).

 We also disagree with Carnation's argument that it was relieved of liability as a surety because it claimed AMT made a binding agreement with Meadowmoor to extend the time of payment without informing Carnation. Assuming arguendo that Carnation was a surety, AMT made no binding agreement with Meadowmoor to extend the time of payment. Meadowmoor remained free to pay at any time. Any time extension was at best for an indefinite time because of Meadowmoor's financial difficulties and AMT's lax payment collection practices. Such an indefinite time extension for payment would not discharge a surety. *See Van de Ven v. Overlook Mining & Dev. Co.,* 146 Wash. 332, 335, 262 P. 981 (1928). Therefore, Carnation's liability for the freight charges was not discharged.

The judgment is affirmed.

RINGOLD, A.C.J., and DURHAM, J., concur.

Reconsideration denied September 23, 1981.

Review denied by Supreme Court December 3, 1981.